IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

THE CITY OF CHARLESTON,
WEST VIRGINIA, a West Virginia
Municipal Corporation; KANAWHA COUNTY,
WEST VIRGINIA; THE KANAWHA COUNTY
COMMISSION; THE CHARLESTON
CONVENTION AND VISITORS BUREAU;
THE KANAWHA-CHARLESTON BOARD OF HEALTH;
     Plaintiffs,

v.

                          Civil Action No.: 16-C- 32
                          Judge: Kaufman

WEST VIRGINIA-AMERICAN WATER COMPANY,
a West Virginia Corporation; AMERICAN WATER
WORKS COMPANY, INC., a Delaware Corporation,
AMERICAN WATER WORKS SERVICE COMPANY,
INC., a New Jersey corporation, EASTMAN CHEMICAL
COMPANY, a Delaware Corporation, GARY SOUTHERN,
and DENNIS FARRELL;
     Defendants.

FOR SERVICE UPON:    EASTMAN CHEMICAL COMPANY
                       C/O THE CORPORATION TRUST COMPANY
                       CORPORATION TRUST CENTER
                       1209 ORANGE STREET
                       WILMINGTON, DELAWARE 19801

## SUMMONS

TO THE ABOVE NAMED DEFENDANT,
IN THE NAME OF THE STATE OF WEST VIRGINIA:

     You are hereby summoned and required to serve upon W. Jesse Forbes, Esq., Forbes Law Offices, PLLC, plaintiff's attorney, whose address is 1118 Kanawha Boulevard, East, Charleston, WV 25301, an answer, including any related counter claim or defense you may have, to the complaint filed against you in the above styled civil action, a true copy of which is herewith delivered to you. You are required to serve your answer **within 30 days** after service of this summons upon you, exclusive of the day of service. If you fail to do so, thereafter judgment, upon proper hearing and trial, may be taken against you for the relief demanded in the complaint and you will be thereafter barred from asserting in another action any claim, cross complaint or defense you may have, which must be asserted in the above styled civil action.

Dated: 1-8-16

                                   Cathy S. Gatson, Clerk
                                   CLERK OF COURT
                                   By J. Bradshaw
                                   Deputy Clerk

EXHIBIT
A

FILED

IN THE CIRCUIT COURT OF KANAWHA COUNTY, WEST VIRGINIA

2016 JAN -8 PM 4: 21

CATHY S. GATSON, CLERK
KANAWHA COUNTY CIRCUIT COURT

THE CITY OF CHARLESTON,
WEST VIRGINIA, a West Virginia
Municipal Corporation; KANAWHA COUNTY,
WEST VIRGINIA, THE KANAWHA COUNTY
COMMISSION; THE CHARLESTON
CONVENTION AND VISITORS BUREAU;
THE KANAWHA-CHARLESTON BOARD OF HEALTH;

     Plaintiffs,

v.                              Civil Action No.: 16-C-32
                                 Judge: Kaufman

WEST VIRGINIA-AMERICAN WATER COMPANY,
a West Virginia Corporation; AMERICAN WATER
WORKS COMPANY, INC., a Delaware Corporation,
AMERICAN WATER WORKS SERVICE COMPANY,
INC., a New Jersey corporation, EASTMAN CHEMICAL
COMPANY, a Delaware Corporation, GARY SOUTHERN,
and DENNIS FARRELL;

     Defendants.

## COMPLAINT

     Plaintiffs, The City of Charleston, West Virginia, a West Virginia municipal Corporation, its

subdivisions; Kanawha County, West Virginia; The Kanawha County Commission; The Charleston

Convention and Visitors Bureau; and The Kanawha-Charleston Board of Health; based on personal

knowledge, information and belief, for their Complaint for damages, equitable, and statutory relief allege

as follows:

## NATURE OF THE ACTION

     1.     The City of Charleston, West Virginia, located in Kanawha County, is the State's capitol

city, and the city is home to the largest city population in West Virginia. Additionally, Kanawha County

is the State's largest county population. Charleston is situated at the confluence of the Elk and

Kanawha Rivers and has made successful efforts to establish itself as a cultural, recreational and business capitol of the Appalachian Mountain Region. Much of Charleston is located along, or in close proximity to, the Kanawha and Elk rivers and the city has a long history involving many festivals, concerts, recreational opportunities, and other events taking place or utilizing its rivers and surrounding natural environment. In recent years, Charleston has hosted a myriad of conventions, events, conferences, performers, concerts, organizations, business groups, festivals, and competitions drawing visitors and crowds from around the region and beyond. Moreover, venues such as the Haddad Riverfront Park, Magic Island, Charleston Civic Center, the Charleston Municipal Auditorium, the Clay Center for the Arts and Sciences, Appalachian Power Park, and various shopping areas, entertainment venues, restaurants, and other attractions draw crowds and visitors to the City of Charleston throughout the year.

2.      With approximately two-thirds (2/3) of the U.S. population within 500 miles of the City and County, an easily accessible airport, and the confluence of three interstates, tourism is big business in the City and County. The annual economic impact is in the hundreds of millions of dollars while simultaneously supporting thousands of jobs and substantial tax revenue for the City and County. In addition to its time and effort, the City has spent and continues to spend millions of dollars to showcase Charleston as a destination for such events. Among other things, the City has launched "Capitalize Charleston," an economic development initiative designed to engage and involve members of the City's community to attract additional regional, state and national meetings, conventions and events to the City. As a further example, the City has also made a tremendous investment in re-vitalizing and expanding the Civic Center estimated at nearly a $100 million for the entertainment and convention centerpiece of Charleston.

Additionally, Kanawha County, West Virginia is the state's most populous county and is home to the State's capitol city of Charleston. It has a rich history of tourism, festivals, and events that bring many visitors to the area. The county has earned recognition in information technology, medical research, chemical synthesis research, and telecommunication and has made significant investments in infrastructure in the area, and otherwise, to attract tourism, promote the County, and attract and sustain future residents and citizens.

3.    On January 9, 2014, approximately 300,000 West Virginians, including the residents of the City of Charleston, and many residents of Kanawha County, lost their water supply as the result of a spill of a coal processing chemical mixture sold and distributed exclusively by Eastman Chemical Company from a facility owned and operated by Freedom Industries, Inc. ("Freedom Industries"). The acts and omissions of the Defendants in, inter alia, causing and/or failing to prevent the chemical spill on or before January 9, 2014, in failing to contain said spill, failing to adequately report said spill, allowing said chemicals to be stored in such a manner, failing to have an adequate secondary containment around the chemical storage area, failing to adequately inspect, monitor, plan for, respond to, or prevent said chemicals from spilling into the Elk River and from entering into the water intakes of West Virginia-American Water Company and from there being distributed throughout a water system of more than 300,000 people, including the entire City of Charleston, and much of Kanawha County, have placed the aforementioned attractiveness, desirability and reputation of the City of Charleston and Kanawha County, and all the Plaintiffs, in serious peril and have caused untold damages both in terms of the loss of immediate revenue due to the extensive shutdown of, and limitations on, restaurants, hotels, and other businesses; the costs associated with City of Charleston and Kanawha County workers responding to the resulting crisis; and the short and long term impact of the damage to the city and county's overall reputation, image, marketability, tax revenues, tourism, fees, and other damages.

3

4.     The chemical, 4-methylcyclohexane methanol, along with other chemicals, commonly referred to as "Crude MCHM", spilled into the Elk River just above its confluence with the Kanawha River in downtown Charleston upstream from West Virginia-American Water Company's water treatment plant in Charleston, West Virginia.

5.     Crude MCHM then began to enter the intake for the water treatment plant making essential adequate and fair warning about the true dangers of Crude MCHM and its breakdown chemicals.

6.     Defendants could have prevented or avoided this accident with precautionary measures, compliance with applicable regulations, and the use of reasonable care. The foreseeable risks of harm posed by Crude MCHM could have been avoided by reasonable instructions or warnings accompanying the sale and delivery of Crude MCHM in the stream of commerce, through the MSDS process and when it became clear that Crude MCHM had been released into the environment. Those omissions render the product not reasonably safe. Exposure to Crude MCHM in the environment through human pathways caused bodily injury and Defendants should establish a medical monitoring program to protect the public from the risk of exposure to Crude MCHM.

7.     West Virginia-American Water Company failed to take reasonable care and failed to recognize and appreciate the risk presented by the presence of Freedom Industries' facility just upstream from their intake, and should, at a minimum, have determined what chemicals were stored or processed at the site, assessed the risk they presented to the water supply and, at a minimum, either secured an alternate water supply to use in the event of foreseeable emergency or created an alternative plan, such as closing its intakes, to prevent contamination of the water supply to The City of Charleston and Kanawha County, and their residents and businesses.

8.      Businesses in The City of Charleston who pay taxes to The City of Charleston based on business revenue lost hundreds of millions of dollars of revenue because of the spill and the resulting necessary "Do Not Use" order.  The spill and "Do Not Use" order affected service businesses in the City of Charleston that are dependent upon water especially hard.  Some of these businesses were forced to shut down permanently as a proximate result of Defendant's misconduct. Additionally, property values throughout the area affected have been jeopardized, causing damages to tax bases for the city and county.

9.      Residents of The City of Charleston and Kanawha County, West Virginia were exposed to the contaminated water and the polluted air and thus require medical monitoring.

10.     The City of Charleston, the Charleston Convention and Visitors Bureau, the Kanawha-Charleston Board of Health, Kanawha County, West Virginia, Kanawha County, and the Kanawha County Commission all incurred costs and expenses directly related to the contamination of the water supply, and have all suffered damages including loss of taxes, future expenses, reputation damages and other damages to be determined.

## PLAINTIFFS

11.     Plaintiffs are The City of Charleston, a municipal corporation, its subdivisions; Kanawha County, West Virginia; the Kanawha County Commission; the Charleston Convention and Visitors Bureau; and the Kanawha-Charleston Board of Health.  Each have suffered economic losses, property losses, damage to tax revenues, harm to reputation, general damages, and other losses or injuries as the result of the Elk River spill. The Plaintiffs all have suffered an array of damages from the spill, specifically and as explained in more detail herein, and future losses.

## DEFENDANTS

12.     Defendant American Water Works Company, Inc. ("American Water") is a Delaware Corporation having its principal place of business in Voorhees, New Jersey. Defendant American Water bears legal responsibility for the damages stemming from the contamination of the water supply. Its acts and omissions include its failure to require, capitalize, and fund the development of an alternate water supply and to properly oversee and manage its wholly-owned and controlled subsidiaries, West Virginia-American Water Company and American Water Works Services Company, Inc. ("Services"). Defendant American Water exercises full dominion and control over its subsidiaries Defendants Services and West Virginia-American Water Company ("WVAW"). Defendant American Water is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

13.     Defendant American Water Works Service Company, Inc., is a New Jersey corporation and wholly-owned subsidiary of Defendant American Water Works Company, Inc. having its principal place of business in Voorhees, New Jersey. Defendant Services negligently performed management, engineering, and water quality services on behalf of American Water for Defendant West Virginia-American Water Company and as such, Defendant Services bears legal responsibility for the damages stemming from the distribution of Crude MCHM into the public water supply. As the service arm that actually performed all of the work required by its sister company, Defendant American Water Works Services Company, Inc., is liable for the failure to properly warn The City of Charleston, Kanawha County, all Plaintiffs, its residents and businesses and others of the nature of the contaminated water. Its acts and omissions include failure to properly assess, plan for, and respond to an obvious environmental risk about which it knew or should have known. Defendant Services is jointly and severally liable to Plaintiffs for all damages and other relief awarded as a result of this action.

6

14.     Defendant West Virginia-American Water Company ("WVAW"), is a West Virginia Corporation with its principal place of business in Charleston, West Virginia. Defendant WVAW bears legal responsibility for the damages stemming from the distribution of Crude MCHM into public water supply. Its acts and omissions include its failure to properly assess, plan for and respond to an obvious environmental risk about which it knew or should have known and its failure to maintain its facilities in sound, workable condition so to avoid releasing the hazardous chemicals it stored and distributed. Further, Defendant WVAW is liable for damages stemming from its failure to warn its customers. Defendant WVAW is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

15.     Defendant Eastman Chemical Company ("Eastman") is a Delaware Corporation with its principal place of business in Kingsport, Tennessee. As the manufacturer and distributor of Crude MCHM, Defendant Eastman had a duty to protect the public from and give adequate warning of the dangers stemming from the release of Crude MCHM in the Elk River. Through its acts and omission Eastman negligently characterized the risk of Crude MCHM, failed to properly warn of its potential environmental and health hazards and sold a hazardous chemical to a suspect facility upstream from a municipal water supply. Defendant Eastman is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

16.     Defendant Gary Southern is a Marco Island, Florida resident above the age of majority. He bears responsibility because of his personal role in directing operations at the facility of Freedom Industries for the two years prior to the spill of Crude MCHM into the Elk River and because he profited from the sale of his interest in a closely-held company as part of the set of mergers and acquisitions which resulted in the Freedom Industries corporate, ownership and management structure

7

prior to the leak of Crude MCHM on January 9, 2014. Defendant Southern is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

17.    Defendant Dennis P. Farrell is a Kanawha County, West Virginia resident above the age of majority. He bears responsibility because of his personal role in directing operations at the facility of Freedom Industries and because he profited from his ownership interest in the facility which he ultimately sold. Defendant Farrell is jointly and severally liable to the Plaintiffs for all damages and other relief awarded as a result of this action.

## ALLEGATIONS

18.    Freedom Industries used, controlled, distributed, transported, and disposed of Crude 4-methylcyclohexane methanol, a known toxic chemical used in the froth flotation phase of coal processing.

### The Elk River Spill

19.    The tank storing the Crude MCHM on the premises of Freedom Industries was built using rivet construction in the 1930's.

20.    Defendant Eastman sold Crude MCHM to Freedom Industries and either knew or should have known of the obvious poor conditions and environmental practices at the site and knew or with the exercise of reasonable diligence should have known of the threat of chemical release into the Elk River. Given the known toxicity of Crude MCHM and Eastman's own research, Eastman knew or should have known that its MSDS and other disclosures and warnings accompanying its sale of the product were insufficient under the circumstances.

8

21.     On or about January 9, 2014, government officials discovered a licorice smell originating from the facilities of Freedom Industries. The licorice smell is associated with Crude MCHM at concentrations exceeding the chemical's odor threshold (although the MSDS sheet issued by Defendant Eastman for Crude MCHM lists the odor associated with the chemical as that of alcohol rather than licorice).

22.     Airborne release of Crude MCHM from the Freedom Industries facility caused chemical air pollution resulting in ambient concentrations well above the odor threshold for the chemical over an area of several square miles and over a time period of several days after the January 9, 2014, release.

23.     For several days before the January 9, 2014 release, citizens in the Charleston area detected the licorice smell, which had been noted and reported to Defendant WVAW and government authorities in the past by residents.

24.     Defendant WVAW initially reported that only two thousand (2,000) to five thousand (5,000) gallons of Crude MCHM leaked into the Elk River. However, upon information and belief the volume of the release was greater than ten thousand (10,000) gallons.

25.     Crude MCHM migrated from the facility of Freedom Industries into the Elk River and thence downstream into the public water intake of Defendant WVAW.

26.     A sheen could be still be seen emanating from the facility of Freedom Industries on the afternoon of January 10, 2014, and tests show that the concentration of Crude MCHM in the Elk River at the water intake point was in excess of 500 parts per billion (500 ppb) approximately thirty-six hours after the spill was first discovered.

27.     The temporal and geographic extent of the contamination, the reports of earlier detection of Crude MCHM above the odor threshold, and the age of the Crude MCHM tanks indicate

9

that Crude MCHM had in all likelihood been leaking from the storage tank for a period of time pre-dating January 9, 2014.

28.     Defendant WVAW operates a water-treatment plant just downstream from the facility of Freedom Industries. As such, WVAW had a responsibility to perform full risk assessment of any potential sources of pollution upstream from its water intake on the Elk River. Such a risk assessment should have encompassed the known risk presented by the Freedom Industries facilities and storage of toxic chemicals including Crude MCHM.

## The Contamination at WVAW Water Treatment Plant

29.     In April 2002, the West Virginia Department of Health and Human Resources (WVDHHR) in a Source Water Assessment Report advised Defendant WVAW that its water supply was highly susceptible to contamination. Further, WVDHHR in that same report specifically advised Defendant WVAW that the "Pennzoil Manufacturing site" was a potential point source of contamination. Freedom Industries facility was situated on the former Pennzoil Manufacturing site. WVAW took little or no action to identify chemicals stored in the tank farm or to plan response to leaks and spills that company managers knew were a possibility.

30.     The WVDHHR report recommended that WVAW develop an alternate water source in the event that the water supply at the current intake became contaminated and suggested that Defendant WVAW create and implement a Source Water Assessment Plan that would provide for an alternate water supply in the event of contamination.

31.     Despite the foreseeable risk of contamination from the nearby Freedom Industries facility, Defendant WVAW did not develop an alternate source of water (either in the form of a reservoir or a second intake on the Elk or Kanawha Rivers) for its 300,000 users in West Virginia or

10

create and implement a Source Water Assessment Plan. (The connections to neighboring water systems are not large enough to support any backup from those sources.)

32.     Indeed, in 2004, Defendant WVAW, eliminated from the Charleston plant monitoring equipment that could have detected, in real time, the presence of organic compounds, including MCHM, in its intake water. Because it had no monitoring equipment in place, WVAW had to depend on Freedom Industries officials, who were trying to minimize the scope of their negligence, instead of having evidence on which to act.

33.     In the weeks leading up to January 9, 2014, Defendant WVAW failed to produce enough clean water to maintain storage capacity within its existing system to provide a reserve in the case of an emergency. Just before January 9, 2014, WVAW was maintaining only about 35% of capacity in its system. WVAW managers had no backup source and failed to maintain even the backup capacity that already existed in their existing system.

34.     Defendant WVAW failed to comply with the standards and requirements set forth under the Safe Drinking Water Act, other state and federal statutes and the common law of West Virginia.

35.     Defendant WVAW, despite having been warned of the foreseeable risk by the WVDHHR in the April 2002 Source Water Assessment Report, failed to implement any means to shut off the water intake in the event of contamination of the Elk River.

36.     Defendant WVAW, despite having been warned of the foreseeable risk by the WVDHHR in the April 2002 Source Water Assessment Report, failed to establish any means to store and/or divert contaminated river water from entering the treatment plant's filters.

37.     Defendant WVAW, despite having been warned of the foreseeable risk by the WVDHHR in the April 2002 Source Water Assessment Report, failed to implement a full activated

carbon treatment system. Instead, it negligently relied on a three-foot activated carbon cap on its sand filters, which was and is wholly inadequate.

38.     Defendant WVAW, without fully assessing the risk, dosed the raw water coming into the plant with potassium permanganate, a chemical oxidizing agent "incompatible" with Crude MCHM as stated on Eastman's MSDS.

39.     The highest concentration plume of MCHM/PPA in the Elk River took considerable time to pass the WVAW water intake. If Defendant WVAW had been prepared for the contamination with monitoring equipment, a source water protection plan and had maintained required reserves in its existing system, the crisis could have been averted by closing the Elk River intake for part of a day while the WVAW's plant filters addressed the lower concentrations of MCHM/PPH after the initial plume had passed.

40.     Though Defendant WVAW was notified in the morning of January 9, 2014 that MCHM was in the Elk River, it failed to issue a "do not use" notice to the public until 6 p.m. that evening. Defendant WVAW's response to the crisis was chaotic, ineffective and irresponsible.

41.     Defendant WVAW filled tankers with contaminated water from the treatment plant in Charleston and then distributed that water to individuals seeking emergency replacement water supplies.

42.     Defendant Eastman sold Crude MCHM, which is a waste by-product or coproduct resulting from Eastman's manufacture of chemicals used to make high performance polyester copolymers. Defendant Eastman produced and sold the Crude MCHM at issue in this matter.


Production and Sale of the Crude MCHM by Eastman

43.     The combination chemical pure Crude MCHM is not found in nature and consists of a methyl group combined with a hexane ring and methanol. Crude MCHM contains various other chemicals, including free methanol.

44.     Eastman produces Crude MCHM as a byproduct of the manufacture of the more valuable chemical commodity, 1,4-cyclohexanedimethanol (referred to hereafter as "CHDM" and marketed by Eastman as Eastman CHDM-D and Eastman CHDM-D90), a chemical used to make polyethylene terephthalate (PET) products, polyesters used in food packaging applications.

45.     Upon information and belief, Eastman's Crude MCHM "product" has many waste-like characteristics, including, but not limited to, the following:

(1) Crude MCHM is not specifically marketed by Eastman as a product and Eastman has not bothered even to create a Crude MCHM "Product Data Sheet," a sheet that Eastman uses to highlight its commercial products' uses and attributes for marketing purposes;

(2) Crude MCHM is never made to order or to satisfy the demands of purchasers of Crude MCHM, but, rather, is only ever produced as a byproduct when Eastman produces CHDM to satisfy the demands of purchasers of its CHDM;

(3) Eastman sells its Crude MCHM "as is" as it comes out of the waste line of the CHDM process stream;

(4) Eastman does not further refine or distill Crude MCHM to meet any specifications for the "active" ingredient, which ostensibly is MCHM (hence the designation "Crude" MCHM);

(5) Crude MCHM is not commercially viable as a stand-alone product, while CHDM would be a commercially viable product to Eastman even without the contribution from sales of the byproduct Crude MCHM; and

(6) Crude MCHM is barely marketable as a retail chemical for its use as a coal flotation frother, such that the only mention of this use that can be found online (apart from reports on the instant chemical spill) is contained in a 1990 patent that the patent holder allowed to lapse in 1998 rather than pay the minuscule patent maintenance fee.

46.     Defendant Eastman has a duty to properly characterize the toxicity of the chemicals it sells, to warn the public of the dangers associated with any known toxicity and to take appropriate measures to ensure safe handling by its customers given Eastman's knowledge of the dangers posed by the product should it be released into the environment.

47.     Defendant Eastman had a duty to characterize the environmental and health risks of Crude MCHM, did so negligently and with conscious disregard of the chemical's toxicity/corrosivity and caused the damages complained of herein. That fact that Crude MCHM may break down in the environment is well known and foreseeable. The likely breakdown and metabolite chemicals of Crude MCHM are known to be dangerous and toxic, including, but not limited to, neurotoxins, like formaldehyde.

48.     Defendant Eastman failed to properly characterize and therefore failed to warn properly of the risk to public health and the environment of the toxicity of Crude MCHM in that internal reports about the product's toxicity reached conclusions of low toxicity when the data in those internal reports implicated higher toxicity.

49.     Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it assumed the Crude MCHM would be confined to the controlled industrial setting of a coal processing plant instead of released into the environment where residential contact would be foreseeable. Given the history of discharges of coal slurry into both surface and groundwater by the coal industry, and the open and obvious perils given the manner in which

14

Freedom Industries stored chemicals at and operated its facility, Defendant Eastman reasonably should have foreseen that even when used in a controlled coal processing plant, Crude MCHM may be introduced into the environment.

50.    Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it ignored the objective data collected in its study "Determination of Ready Biodegradability (Biotic Degradation) Using the CO2 Evolution Test (Modified Sturm)," concluding that "it is unlikely the test substance would persist in an aquatic environment as evidenced by the significant carbon dioxide evolution," despite the fact that the "crude material contained significant impurities including water."

51.    Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment by requesting, as the study sponsor, that stability of Crude MCHM not be determined prior to commencing testing and requesting that the uniformity/concentration of Crude MCHM not be confirmed in a test entitled, "An Acute Aquatic Effects Test with the Fathead Minnow."

52.    Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when the cause of death of twenty rats "was not determined" in an Eastman study entitled "Acute Toxicity of 4-Methylcyclohexane Methanol."

53.    Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it again did not determine the cause of death of two rats who died during a test of "Acute Dermal Toxicity in the Rat for Crude MCHM."

54.    Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment when it ignored deaths, erythema, desquamation, moderate to severe transient weakness, prostration, stumbling, red urine, and splenic lesions noted during the test of "Acute

Dermal Toxicity in the Rat for Crude MCHM" in which Defendant Eastman concluded that despite these results the substance was only "slightly toxic."

55.    Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment and the toxic genetic risk of pure Crude MCHM, Crude MCHM or the potential breakdown chemicals, if either were to be released in the environment where humans could be exposed.

56.    Defendant Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment posed by pure MCHM or Crude MCHM by failing to consider the breakdown chemicals that would result from reactivity between pure MCHM and Crude MCHM and chemicals used in the treatment of municipal water supplies, as well those as found in the environment.

57.    The known risks of exposure to Crude MCHM breakdown chemicals were not disclosed by Eastman. Eastman failed to characterize and therefore failed to warn properly of the risk to health and the environment of Crude MCHM or its known toxic constituent and/or breakdown chemicals.

58.    The foreseeable risks of Crude MCHM could have been reduced or avoided by reasonable instructions or warnings. Their omission renders the Crude MCHM unsafe and unreasonably dangerous.

59.    Defendant Eastman in its MSDS sheet for Crude MCHM described as unknown the chemical's reactivity. Defendant Eastman had a duty to investigate the chemical's reactivity but failed to undertake the necessary research.

60.    Defendant Eastman owes a duty under applicable statutory and common law to make full disclosure of threats to human health in MSDS sheets for Crude MCHM and to reflect accurately the state of knowledge of the medical and scientific communities about the toxicity of Crude MCHM.

61.    Defendant Eastman placed Crude MCHM into interstate commerce. The foreseeable risks of harm posed by Crude MCHM could have been reduced or avoided by reasonable instructions or warnings. Their omission renders the product not reasonably safe.  Crude MCHM is unreasonably dangerous.

62.    Defendant Eastman issued MSDS sheets and other warning data that were insufficient, inadequate, and not protective of human health and the environment.

63.    Because Defendant Eastman's MSDS sheets did not accurately characterize the toxicity of Crude MCHM and thus the foreseeable risks posed by its release, it was reasonably foreseeable for the City to incur damages as well as for its businesses to refrain from operating and/or to incur additional costs associated with operating with bottled water regardless of assurances of water safety by government officials.

64.    Defendant Eastman improperly disclosed in its MSDS sheets numerous items for which Defendant Eastman alleged that data was not available when Defendant Eastman should have relied on myriad sources of available data including its own testing of Crude MCHM and scientific literature disclosing known health effects of its component, constituent, breakdown, and/or metabolite chemicals.

65.    Defendant Eastman improperly disclosed its MSDS sheets information relating to the corrosive nature of Crude MCHM which significantly contributed to the leak at Freedom Industries.

66.    Defendant Eastman failed to disclose the full extent of its knowledge of the potential adverse health impacts of Crude MCHM.

67.    Defendant Eastman failed to provide proper chemical analysis of Crude MCHM to customers.

17

68.    Defendant Eastman failed to disclose to customers, regulators or the public, either via statutory notice, MSDS sheet or public announcement the fact that aldehydes (*i.e.*, certain type of organic compounds) were expected to be part of the chemical composition on MCHM.

69.    Defendant Eastman, at the very least, failed to know and understand the nature of the operations of its customer, Freedom Industries, who purchased Crude MCHM.

70.    Defendant Eastman failed to comply with the standards and requirements of the common law of West Virginia.

## Allegations Concerning Other Defendants

71.    Defendant Dennis Ferrell was an owner and executive at Freedom Industries with the power and authority to effectuate the necessary repairs which would have avoided the spill into the Elk River, but he chose to do nothing instead.

72.    Shortly before the Elk River Spill, Defendant Gary Southern sold his interest in Enviromine, LLC to Chemstream, LLC for several million dollars. By completing the acquisition and agreeing not to compete with Freedom Industries, Mr. Southern made $9 million for his part in acquisitions by Chemstream, LLC that sealed its control of Freedom Industries and its key personnel. Mr. Southern, due to his position of authority and supervision over the operation of the Freedom Industries facilities, was in a position to know and correct the environmental problems which led to the toxic release complained of herein. He testified during bankruptcy proceedings that he had substantial involvement with the facility for a period of years preceding the spill.

73.    Mr. Southern knew or should have known about the conditions at the facility. His acts and omissions in ignoring the obvious threats to the environment and failure to take appropriate steps to mitigate them directly contributed to Plaintiffs' damages.

74.     Despite the smell of Crude MCHM emanating from the facility in the days prior to the spill, no emergency action was taken by Defendant Southern to remedy the situation or begin emergency repairs or to remove the chemicals from the facility.

75.     During a hearing on January 20, 2014, Defendant Gary Southern, former president of Freedom Industries, gave differing accounts of his relationship with investor J. Clifford Forrest, at one point denying knowing him and later admitting that he had a conversation with him the day before the hearing.

76.     Defendant Gary Southern, former president of Freedom Industries, claimed to have no knowledge as to the location of a one million dollar ($1,000,000) escrow reportedly provided by Forrest through Chemstream Holdings as a condition of merger and earmarked for repairs, including of the secondary containment area which precipitated the events at issue here when it failed.

77.     The fact a one million dollar ($1,000,000) escrow for repairs was even a part of the Freedom Industries merger shows that Defendant Southern had actual knowledge of the site's condition, which not only imputes duty but also qualifies Southern and Farrell as "operators" under applicable state law.

## Health Effects of the Elk River Spill and Contamination

78.     Dr. Rahul Gupta, then executive director of the Kanawha-Charleston Board of Health, released calculations on or about April 23, 2014, putting the number of people who experienced negative health effects related to the water contamination complained of herein at nearly ninety-three thousand (93,000).

79.     Dr. Gupta also released results of a community-wide survey by the Kanawha-Charleston Board of Health on the impact of the January 9, 2014, chemical spill and water contamination, which

showed that thirty-two percent (32%) of the respondents reported a member of their household had an illness related to the chemical spill.

80.    Dr. Gupta's research revealed that over twenty percent (20%) of the residents sought medical advice or attention related to the water contamination complained of herein.

81.    Dr. Gupta's research indicated that residents of The City of Charleston, and Kanawha County, West Virginia and elsewhere in the region served by American Water suffered from rashes, diarrhea, abdominal pain, cramps, nausea, vomiting, eye irritation, headaches, dizziness, and respiratory symptoms. All of these reactions are consistent with the testing conducted by Eastman and as it reported in its MSDS sheets for MCHM.

## CAUSES OF ACTION

### Count One - Negligence

82.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

83.    The conduct, acts and omissions of the Defendants violated duties owed to Plaintiffs. Defendants' negligence proximately caused damage to Plaintiffs.

### Count Two - Negligence against American Water Defendants

84.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

85.    The American Water Defendants (Defendants American Water, Services, and WVAW) owed a duty of reasonable care to Plaintiffs and the residents and businesses of The City of Charleston and Kanawha County which duty was breached by a variety of acts and omissions including, but not

20

limited to, failure to address the foreseeable risk posed by the Freedom Industries facility and as warned of by the WVDHHR, failure to adequately warn The City of Charleston, and Kanawha County, and their residents and businesses, · failure to design, maintain, and operate its water treatment plant according to industry standards so as to protect public health and safety, negligently and unreasonably delivering and placing on the property of The City of Charleston, Kanawha County, its residents and businesses a toxic and noxious substance, Crude MCHM, and failure to ensure that water tankers were not filled with contaminated water. Those breaches proximately caused the damages complained of herein.

86.     American Water was negligent in at least the following respects:

(1) Failing to address the foreseeable risk warned of by the WVDHHR;

(2) Failing to ascertain the nature and extent of potential threats to the Elk River water supply, such as the Etowah River Terminal storage facility, and to take appropriate steps to prepare for the possibility of a chemical leak;

(3) Failing to monitor and maintain adequate water reserves in the event of a necessary disruption of the water intake and purification process;

(4) Failing to maintain and monitor appropriate carbon filtration reserves;

(5) Negligently and unreasonably delivering and placing on the property of The City of Charleston, its residents and businesses a toxic and noxious substance, Crude MCHM;

(6) Failing to take appropriate steps after learning of the upstream chemical leak from the Etowah River Terminal, such as contacting CHEMTREC or the manufacturer of the chemical, to obtain information necessary for the prompt protection, remediation, and restoration of its water treatment facilities and water supply;

(7) Failing to adequately warn The City of Charleston, and Kanawha County, and their residents and businesses ;

(8) Failing to ensure that water tankers were not filled with contaminated water during the emergency response; and

(9) Failing to take appropriate and prompt steps to flush its water treatment facility and water supply system.

87.    Defendants' negligence was the proximate cause of Crude MCHM, a noxious and/or toxic substance, invading the real and personal property of The City of Charleston and Kanawha County and its property-owning residents and businesses and causing substantial harm to real property from the loss of use and enjoyment and from the contamination of real property fixtures such as pipes, which required cleaning by flushing. Defendants' negligence was also the proximate cause of substantial harm to personal property such as appliances from the temporary loss of use of personal property and from the contamination of the personal property of the residents The City of Charleston and Kanawha County.

88.    As a proximate result of American Water's negligence, Plaintiffs and residents and businesses in The City of Charleston and Kanawha County, West Virginia who were customers of American Water were instructed not to use their tap water for any purpose other than toilet flushing and firefighting for five-to-eight days. The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter.

89.    As a proximate result of Defendant American Water's negligence, thousands of residents of The City of Charleston and Kanawha County were unable to work and earn regular wages. Many of these residents may have no property interest affected by the Elk River chemical spill, but were nevertheless unable to work and earn regular wages. Thus, Defendants American Water, Services, and

WVAW are liable for lost wages and for The City of Charleston's and Kanawha County's concomitant lost revenue, as well as damages stemming therefrom.

90.   Defendant American Water negligently failed to adequately capitalize its wholly-owned subsidiary, Defendant WVAW, despite being warned in April 2002 by the West Virginia Department of Health and Human Services of the susceptibility of its water supply to contamination; such failure constituted, in each successive budget year, a series of independent negligent acts that foreseeably resulted in past and future damages to Plaintiffs.

## Count Three - Negligence against Eastman

91.     Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

92.     Defendant Eastman owed a duty of reasonable care to The City of Charleston, Kanawha County, its residents and businesses that was breached by Eastman's failure to prepare for and maintain proper stewardship of their product by knowingly or negligently delivering to a facility without the capacity to safely store the delivered product. Further, Defendant Eastman breached its duty by failing to properly warn of foreseeable risks, including in its MSDS sheets. Additionally, Defendant Eastman committed two independent acts of negligence when in 2005 and again in 2011, Defendant Eastman failed to properly characterize and warn The City of Charleston, its residents and businesses of the adverse health effects of Crude MCHM. Finally, Defendant Eastman breached its duty to The City of Charleston and Kanawha County, its residents and businesses by failing to properly warn of foreseeable risks after it became clear that The City of Charleston and Kanawha County, its residents and businesses were being exposed outside of a controlled industrial environment.

93.     Upon information and belief, Crude MCHM is a corrosive chemical (unlike pure MCHM, an organic, and unlike the gasoline and diesel products originally stored at the Etowah River Terminal site) because of the high percentage of water (4% to 10%) contained within it and its tendency to separate during storage into an organic layer and a corrosive water layer.

94.     Upon information and belief, the end-use, retail market for Crude MCHM is so limited, depressed, and sporadic that Crude MCHM could not be stored by a distributor in a manner that complied with industry standards for the storage of such chemicals (*i.e.*, in properly constructed, maintained, and regularly inspected tanks) and still be sold by the distributor at a profit. In other words, in order for the Etowah River Terminal or any other distributor to make a profit selling Eastman's

Crude MCHM, the distributor has to store the chemical in a cut-rate (dilapidated or outdated) tank and ignore costly industry standards for the maintenance and inspection of tanks containing corrosive chemicals (or even non-corrosive chemicals).

95.   Upon information and belief, Eastman knew or should have known that the enduse, retail market for Crude MCHM is so limited, depressed, and sporadic that Crude MCHM cannot be stored by a distributor in a manner that complies with industry standards for the storage of such chemicals (*i.e.*, in properly constructed, maintained, and regularly inspected tanks) and still be sold by the distributor at a profit.

96.   Upon information and belief, Eastman knew or should have known that the Etowah River Terminal and Freedom Industries were not storing Crude MCHM in a manner that complied with industry standards for the storage of chemicals (*i.e.*, in properly constructed, maintained, and regularly inspected tanks).

97.   Eastman could have disposed of its Crude MCHM – the waste-like byproduct of Eastman's process for making CHDM -- as a solid waste product pursuant to the rules and regulations promulgated by the State of Tennessee for the disposal of industrial solid waste products. Had Eastman done so, the recipient of Eastman's Crude MCHM (or Eastman itself, had it elected to incinerate it) would have been subjected to periodic inspections to ensure compliance with Tennessee's statutes and regulations governing the disposal of industrial wastes, one of the most obvious and fundamental purposes of which is to prevent industrial byproducts and waste from ending up in public rivers and contaminating public water supplies. However, Eastman would have had to pay to dispose of its waste-like Crude MCHM as an actual waste, and would also have lost whatever small sums it received from selling Crude MCHM as a "product."

25

98.     Upon information and belief, Eastman knew or should have known that the only business that would pay even a small sum for the receipt of Crude MCHM as a "product" to be distributed was the kind of business that Freedom Industries and the Etowah River Terminal have been demonstrated to have been: cut-rate businesses operating with short-term profit horizons, on the margins of legality, and with little regard for chemical industry standards and public safety.

99.     Eastman knew or should have known that there was a real and substantial danger that the Crude MCHM it was "selling" as a "product" would be stored improperly or otherwise mishandled and end up involved in an environmentally catastrophic release and contamination like the one that occurred.

100.    A reasonably prudent person or company, knowing what Eastman knew or should have known about the retail market for its waste-like Crude MCHM, and knowing what Eastman knew or should have known about operations at the Etowah River Terminal, would have disposed of its crude byproduct as a waste, pursuant to Tennessee's regulations, and thereby avoided the unnecessary risk of an environmentally catastrophic release like the one that occurred.

101.    Eastman's negligence was a proximate cause of the chemical spill, as a result of which Plaintiffs and the residents and businesses of The City of Charleston and Kanawha County as customers of American Water were instructed not to use their tap water for any purpose other than toilet flushing and firefighting for five-to-eight days. The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter.

102.    Defendant Eastman's negligence was a proximate cause of the chemical spill and the past, present and future damages to The City of Charleston and Kanawha County, and its residents and businesses.

26

## Count Four - Negligence Against Gary Southern

103.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

104.    Defendant Gary Southern owed a duty of reasonable care to The City of Charleston, Kanawha County, its residents and businesses which duty was breached by a variety of acts and omissions including, but not limited to, failure to immediately address the foreseeable risk apparent upon assuming control. Those breaches proximately caused the damages complained of herein.

105.    Defendant Southern knew or should have known of the inherent dangers with the condition of the Freedom Industries' site prior to the spill and should have taken steps to prevent the spill.

106.    Defendant Southern had a duty to obey the laws and regulations of the State of West Virginia of which his breach proximately caused the damages complained of herein.

107.    Defendant Southern's conduct, acts, and omissions constitute the tort of negligence.

## Count Five - Negligence Against Dennis Farrell

108.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

109.    Defendant Dennis Farrell owed a duty of reasonable care to The City of Charleston, Kanawha County, its residents and businesses which duty was breached by a variety of acts and omissions including, but not limited to, failure to immediately address the foreseeable risk apparent upon assuming control. Those breaches proximately caused the damages complained of herein.

110.   Defendant Dennis Farrell knew or should have known of the inherent dangers with the condition of the Freedom Industries' site prior to the spill and should have taken steps to prevent the spill.

111.   Defendant Farrell had a duty to obey the laws and regulations of the State of West Virginia of which his breach proximately caused the damages complained of herein.

112.   Defendant Farrell's conduct, acts and omissions constitute the tort of negligence.

## Count Six - Gross Negligence

113.   Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

114.   The conduct of Defendants as set forth herein was reckless and wanton, constituting the tort of gross negligence, which resulted in damages to Plaintiffs.

115.   Defendants American Water, Services, and WVAW are liable for their gross negligence because of the reckless manner in which they ignored threats to The City of Charleston and Kanawha County and the health of the residents and businesses of The City of Charleston and Kanawha County both in the design and maintenance of their operations, their warnings and their attempts at delivering water.

116.   Defendant Eastman is liable for its gross negligence because it knowingly failed to properly characterize the risk and thus provide proper warnings necessary to protect the public. Defendant Eastman was reckless and wanton in its decision to sell its waste as a "product." Further, Defendant Eastman was reckless in its sale of such a toxic product to a suspect facility located on a river bank in the middle of highly-populated metropolitan area.

117. Defendants Southern and Farrell are liable for their gross negligence because they understood the threat posed by the facility but took no actions to avert the water contamination.

**Count Seven - *Prima Facie* Negligence Against the American Water Defendants for Violations of Drinking Water Treatment State Revolving Fund Act, the Safe Drinking Water Act, and Primary Statutory Duty of Safety and Convenience to the Public**

118. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

119. The failure by Defendants American Water, Services, and WVAW to establish and maintain adequate and suitable facilities and perform its service in a way that is reasonable, safe, and sufficient for the security and convenience of the public, violated its primary statutory duty to The City of Charleston, Kanawha County, its residents and businesses pursuant to W. Va. Code § 24-3-1.

120. The failure by Defendants American Water, Services, and WVAW to adopt a source water protection plan, pursuant to W. Va. Code R. § 64-77-5.2, constitutes *prima facie* negligence. W. Va. Code R. § 64-77-5.2 requires that "a source water protection plan shall be adopted by the public water system for the continued protection of the watershed from potential sources of contamination."

121. The failure by Defendants American Water, Services, and WVAW to adopt a source water protection plan is in contravention the W.Va. Code §16-13C-1 through 6 (the Drinking Water Treatment State Revolving Fund Act implemented by the Secretary of HHR through W. Va. C.S.R. § 64-77-5.2), requiring a source water protection plan be adopted by public water systems, including WVAW. This regulation was adopted pursuant to W. Va. Code §§ 16-1-4 (a) and (b)(3-4), which grant the Secretary of the Department of Health and Human Resources the authority to propagate regulations addressing sources of water supply and safe drinking water.

122.    Pursuant to W. Va. C.S.R. § 64-77-11, violators of W. Va. C.S.R. § 64-77-5.2 are subject to the civil, administrative, and criminal penalties of the Public and Community Water Systems and Administrative Penalties Act, W. Va. Code §§ 16-1-9a(d)(2) and (3) and § 16-1-9a(d)(1), as well as 16-1-9 and 16-1-18.

123.    "The State of West Virginia provides for the regulation of public water supplies to promote and protect the public health by having the public served safe and potable water. The West Virginia Department of Health and Human Resources, Bureau for Public Health is empowered to adopt rules to implement the intent of the law." W. Va. Code R. § 64-77-1. The administrative rule requiring all public water systems to adopt a source water protection plan was designed to prevent contamination of the public water supply and to protect the users of that water supply from injuries caused by contaminated water. As consumers of a public water supply, The City of Charleston, its residents and businesses are those whom that said rule was designed to protect.

XX.    As indicated in the testimony of a West Virginia Public Service Commission (WVPSC) engineer, the American Water Defendants' actions were in violation of 150 *C.S.R.* §§ 7.4.1.a; 7.4.12c-i; 7.4.14; 7.5.1a-d, f; 7.5.6a; and 7.5.9a-b.

XX.    As indicated in the testimony of a WVPSC engineer, the American Water Defendants' actions also violated *W. Va. Code* § 24-2-7 in, at least, the following ways:

•    "Allowing a toxin or containment into the public system without sufficient notice to the public as evidenced by the fact of how many people ingested, were exposed or inhaled the contaminants."

•    "Failing to notify the public as quickly as practicable that a containment that may cause a threat to public health and safety had been introduced into the source water."

30

- "Failing to maintain a minimum storage capacity of twice the average daily demand of (150) gallons per person per day plus fire flow."

- "Failing to implement an automatic water conservation/rationing plan when water storage dropped below the minimum two (2) day average demand."

- "Failing to create, implement, and conduct practice drills for an emergency response plan which requires immediate notification to the public to 'DO NOT USE' the water anytime an emergency or spill occurs that may be adverse to human health."

- "Not issuing a 'Do Not Use' public notice when the water storage reserve dropped below one (1) day average demand."

- "Not having an emergency response person designated to respond to the public in emergency situations."

- "Not having a source water protection plan with real executable strategies for protecting the water source."

- "Not having interconnections with adjacent utilities where possible for back up supplies."

124.   Therefore, Defendants American Water, Services, and WVAW are liable for *prima facie* negligence.

### Count Eight –Breach of Express and Implied Warranties and Statutory Violations against American Water

125.   Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

126.   Beginning on or about January 13, 2014, American Water began issuing instructions to customers for the "flushing" of their individual water delivery systems. American Water divided

31

customers into geographical zones and instructed them to perform the flushing steps at different times over the course of several days, from approximately January 13, 2014 to January 17, 2014.

127.   American Water told customers that they could use its water for all purposes, including drinking, after the flushing steps were complete.

128.   However, the water that American Water delivered in the many days immediately following the flushing continued to be contaminated with MCHM. The water was neither pure nor potable. The water continued to have an unpleasant odor and an irritating quality for many days after the systems were flushed.

129.   American Water nonetheless charged customers its regular rate for the use of this impure and non-potable water following the system flushing.

130.   American Water's actions in selling and charging its customers for the use of impure and non-potable water in the days immediately following the flushing was in violation of its express warranty that the water was suitable for all purposes, including drinking.

131.   American Water's actions in selling and charging its customers for the use of impure and non-potable water in the days immediately following the flushing was in violation of its implied warranties under W. Va. Code § 46-2-314, including, but not limited to, its implied warranties that the water pass without objection in the water utility trade and that the water be suitable for the ordinary purposes for which tap water is commonly used, including drinking.

132.   American Water's actions in telling its customers that the water it was delivering to customers' homes in the days following the flushing was suitable for all purposes including drinking were unfair or deceptive acts or practices in violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-6-104, in the following particular respects: (a) 46A-6-102(7)(E) (by representing that the water it was selling was suitable for the use of drinking when it was not and by

representing that it did not have any deleterious characteristics when it continued to be irritating to the eyes and skin); (b) 46A-6-102(7)(G) (by representing that the water it was selling was pure and potable, the standard for utility tap water, and that it was of acceptable quality when it was not); (c) 46A-6-102(7)(L) (by making public statements with respect to the quality, characteristics, purity, and potability of its water that were likely to be confusing and misunderstood); (d) 46A-6-102(7)(M) (by concealing from customers that the water it was selling was still contaminated above the odor- and irritant-thresholds for Crude MCHM and likely to have an unpleasant taste and odor and an irritating quality for many days after the flushing); (e) and 46A-6-102(7)(N) (by making deceptive and misleading public statements concerning the quality, purity, and potability of the water after flushing and causing those statements to be published and broadcast).

133.   The exclusion in West Virginia Code § 46A-1-105(3) does not apply to the allegations in the preceding paragraph for at least two reasons: (1) No agency of the United States or the State of West Virginia regulates discounts allowed for early payment by customers of American Water, and, thus, American Water fails to meet the third of the three requirements for exclusion under section 46A-1-105(3); and (2) The "exclusions" in section 46A-1-105 must be read in connection with the "application" in section 46A-1-104, which applies only to consumer credit sales, consumer loans, and consumer leases, and is intended only to exclude utility fees, late fees, and early payment discounts, to the extent regulated elsewhere, from being characterized and regulated as credit sale transactions under section 46A-1-104. Section 46A-6-101, *et seq.*, the "General Consumer Protection" provision regulates all transactions, without regard to whether those transactions are credit sales, loans, or leases, and prohibits the use of misleading or deceptive statements in connection with the sale of goods, and therefore neither the application in 46A-1-104 nor the exclusions in 46A-1-105 apply to actions for the deceptive or misleading sale of goods under 46A-6-104. Section 46A-6-104 has its own separate set of clear

33

exemptions set forth in section 46A-6-105, which protects publishers and broadcasters from liability for innocently running deceptive advertisements.

134. Plaintiffs are entitled to actual damages and/or statutory damages under West Virginia Code § 46A-6-106 for American Water's violations of its express and implied warranties and West Virginia Code §§ 46-2-314 and 46A-6-104.

### Count Nine - Strict Products Liability for Failure to Warn Against American Water Defendants

135. Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

136. Defendant American Water, Services, and WVAW are liable for failure to warn once they became aware that the Elk River was contaminated and those contaminants were being distributed to the customers.

137. American Water Defendants are sellers and distributors of a product, namely water, and were the suppliers of water to the Plaintiffs at all times relevant herein.

138. At the point that it became known that the water intake was contaminated the distribution of water for sanitation and firefighting purposes became an ultra-hazardous activity.

139. Defendants American Water, Services, and WVAW should have immediately upon understanding that a contaminant had entered their distribution system issued warnings by all means possible to its customers not to contact the water. Instead, the warnings came hours after hundreds of thousands of customers, including pregnant women, had continued to use the water without warnings.

140. The water supplied to the Plaintiffs preceding the "Do Not Use" warning, as well as thereafter, was unreasonably dangerous and entirely defective as it was contaminated with one or more dangerous and/or hazardous chemicals as a result of the water contamination alleged herein.

34

137.   Further, Defendants American Water, Services, and WVAW should have not advised that the water was safe to drink at one part per million (1 ppm) when other respected sources were warning against exposure at far lower levels especially for pregnant women.

## Count Ten- Strict Products Liability for Failure to Warn Against Eastman

141.   Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

142.   Eastman marketed, packaged, sold and distributed Crude MCHM to Freedom Industries.

143.   At all relevant times, Eastman knew or should have known of the adverse health effects and risk of harm from exposure to the Crude MCHM it distributed.

144.   Eastman failed to adequately warn about the adverse health effects, the risks of harm and the need for proper practices in the storage and handling of the Crude MCHM it marketed, sold, distributed, and shipped.

145.   Eastman failed to provide an adequate Material Safety Data Sheet regarding the adverse health effects and risk of harm arising from exposure to the Crude MCHM it marketed, sold, distributed, and shipped.

146.   Eastman, therefore, marketed, sold, distributed and shipped its "product" in an unsafe and unreasonable manner because the foreseeable risks of harm posed by the "product" could have been reduced or avoided by reasonable instructions or warnings, and their omission renders the "product" not reasonably safe.

147.   The Crude MCHM that Eastman sold was unreasonably dangerous and defective due to Eastman's failure to provide adequate warnings and MSDS for safe use of the "product."

148.   Furthermore, Eastman had a duty to fully warn and disclose potential health hazards to the public immediately upon learning that its chemical had been released into a public water supply. Eastman's duty to warn under these circumstances extended to the potential health effects associated with pathways like drinking, cooking, and bathing which would never be specifically factored in or warned against when determining toxicity in the controlled industrial environment of a coal processing plant. In short, no one in a prep plant would ever be expected to take a drink of or take a shower in the slurry water where Crude MCHM is used.

149.   Defendant Eastman Chemical Company, as the manufacturer of Crude MCHM, a waste byproduct that it was selling as a "product," had at least the following duties: to subject its product to appropriate toxicity testing in order to determine its toxicological profile; and to adequately warn all potential users of the product of all known and knowable toxicological hazards associated with the product.

150.   Eastman subjected analytically pure MCHM to a battery of toxicological tests, including eye irritation testing in rabbits, in 1990.

151.   Eastman has never subjected Crude MCHM, the actual "product" that it sells, to eye irritation testing, despite the fact that Eastman knows that Crude MCHM may consist of as much as twenty-eight percent (28%) of chemicals other than water and pure MCHM, and that Crude MCHM contains at least one significant constituent, CHDM, that is a dangerous and strong eye irritant that causes eye burns and that caused "severe" eye irritation in a similar rabbit study.

152.   Eastman's material safety data sheets for its CHDM products identify CHDM as a product that is a "Danger!" because it "Causes eye burns." However, Eastman's MSDS for Crude MCHM identifies it as only causing "skin and eye irritation," even though Eastman has never performed

the rabbit eye irritation test on the crude product itself, which contains CHDM, but only on the pure product, which does not contain CHDM.

153.    Upon information and belief, the Crude MCHM that leaked into the Elk River and contaminated the water is a much more potent eye irritant than the pure MCHM that Eastman tested and upon which Eastman based its eye irritation warning for the Crude MCHM Material Safety Data Sheet.

154.    Upon information and belief, Crude MCHM should have been identified as a dangerous eye irritant that causes severe eye irritation.

155.    Upon information and belief, the Etowah River Terminal and Freedom Industries, while knowingly storing chemicals in substandard tanks on the banks of a river near a major water utility intake, at least thought, based on the material safety data sheets provided by the manufacturers of those chemicals, that the chemicals they were storing so carelessly were relatively non-toxic and non-irritating in dilute concentrations.

156.    Freedom Industries relied on Eastman's negligent testing, negligent failure to test, failure to warn, and inadequate warnings concerning toxicity, in storing Crude MCHM in a manner so likely to result in contamination of the water supply.

157.    Eastman failed to test and to provide necessary solubility data or warnings relating to the likelihood of separation of Crude MCHM into a water layer and an organics layer during storage and the formation of a corrosive water layer on the bottom of any storage tank in which the chemical was stored.

158.    Upon information and belief, Freedom Industries and Etowah River Terminal relied on Eastman's lack of warnings and testing in storing Crude MCHM in poorly-maintained and outdated tanks intended to hold non-corrosive petrochemicals.

159.   Eastman's negligence in testing, failing to test, warning, and failing to warn purchasers about the true toxic and corrosive nature of the product was a proximate cause of the chemical spill, and, as a result, Plaintiffs and all similarly situated residential customers of American Water were instructed not to use their tap water for any purpose other than toilet flushing and firefighting for five-to-eight days. The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter.

160.   Eastman's Crude MCHM was defective, as sold, because it contained inadequate instructions and warnings concerning the true toxic and corrosive nature of the product.

167.   The defective instructions and warnings were a proximate cause of the chemical spill, and, as a result, Plaintiffs and customers of American Water were instructed not to use tap water for any purpose other than toilet flushing and firefighting for five-to-eight days. The water continued to be impure, with an unpleasant odor and irritating quality, for weeks or even months thereafter. Eastman is strictly liable under the law of the State of West Virginia.

168.   As a direct and proximate cause of Eastman's failure to warn, Plaintiffs suffered injuries.

**Count Eleven - Strict Liability for Ultra Hazardous Activities against
Gary Southern, Dennis Farrell and Eastman Chemical Company**

169.   Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

170.   Defendants Southern, Farrell, and Eastman, inclusive, or one or more of them, were engaged in manufacturing, distribution, storage, control, use, transport and disposal of the Crude MCHM in close proximity to the Elk River and WVAW's intake for the water supply of several counties is an ultra-hazardous or abnormally dangerous activity. The storage of harmful chemicals in tanks in bulk quantities on one's property is also an abnormally dangerous activity as is distributing to facilities

38

ill-equipped to handle such toxic materials. Therefore, Defendants Southern, Farrell and Eastman Chemical are strictly liable for all damages that are caused by that activity.

171.    Defendants' conduct, acts, and omissions have: damaged Plaintiffs' property by necessitating the flushing or replacement of pipes, water heaters and other appliances; caused lost profits; and created the need for a medical monitoring protocol to assess the health effects of exposure to Crude MCHM and protect the health of the residents of the City of Charleston and Kanawha County through early diagnosis of dread disease.

172.    Defendants are *prima facie* answerable for all damage to Plaintiffs and their property which is the natural consequence of their ultra-hazardous and abnormally dangerous activities.

173.    Defendants are strictly liable for any and all damages caused by the escape of any materials impounded.

174.    Plaintiffs' injuries were proximately caused by Defendants' ultra-hazardous and abnormally dangerous activities.

175.    Defendants are strictly liable for any and all damages caused by exposure to toxic substances escaping from their operations.

## Count Twelve - Public Nuisance Against All Defendants

176.    Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

177.    Defendants' acts and omissions constitute an unreasonable interference with the exercise of rights common to the general public in that it significantly interferes with public health and safety.

178.    Defendants knew or had reason to know that their activities have a significant effect on public rights.

39

179.   Defendants have acted intentionally or it was reasonably foreseeable to Defendants that their activities would cause harm to Plaintiffs and their property.

180.   Defendants' activities proximately caused Plaintiffs' injuries.

182.   The conduct, acts, and omissions of Defendants as set forth herein created a public nuisance from which the Plaintiffs have derived special injuries which cannot be fully compensated in an action at law.

## Count Thirteen – Equitable Remedy of Medical Monitoring

183.   Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

184.   Crude MCHM is a hazardous substance.

185.   Plaintiffs and the residents of the City of Charleston and Kanawha County have been significantly exposed to Crude MCHM.

186.   The exposure of residents of the City of Charleston and Kanawha County to the Crude MCHM was due to the tortious conduct of the Defendants.

187.   As a direct and proximate result of the exposure, residents of the City of Charleston and Kanawha County have suffered an increased risk of contracting serious latent disease.

188.   The increased risk of disease makes it reasonably necessary for residents of the City of Charleston and Kanawha County to undergo periodic diagnostic medical examinations different from what would be prescribed in the absence of exposure.

189.   Monitoring procedures exist that make the early detection of a disease possible.

190.   The City of Charleston and Kanawha County represents the interests of its exposed population included those who were in utero, infants, and children exposed to a known toxic substance,

Crude MCHM, at a greater concentration than the general public is typically exposed such that the Plaintiffs have an increased risk of contracting latent dread disease for which testing exists different than medical tests required by the general public.

191.   The population of in utero, infants, and children up to the age of five were exposed to levels at or exceeding two parts per million (2 ppm) Crude MCHM in the first twenty-four to thirty-six hours, which is a greater concentration than the general public is typically exposed.

192.   The exposed population in utero, infants, and children up to the age of five, have an increased risk of developing neurological damage, resulting in ADD or ADHD from the toxic insult to the developing brain caused exposure to methanol contained in Crude MCHM.

193.   Cognitive tests for ADD or ADHD, once the exposed population in utero, infants, and children up to the age of five reach an appropriate age, are readily available, generally accepted, and advantageous medically.

194.   A medical monitoring protocol may include follow-up structural tests or other neurological examinations if initial screenings and/or cognitive tests so indicate. Such follow-up structural, and neurological examinations are readily available, generally accepted, and advantageous medically.

195.   A medical monitoring protocol may include data collection incorporating epidemiological data generated by generally accepted medical surveillance techniques as a means of quantifying and identifying ongoing risk factors which may necessitate a change in the medical monitoring protocol for the exposed population in utero, infants, and children up to the age of five.

196.   The City of Charleston and Kanawha County, on behalf of its exposed population in utero, infants, and children up to the age of five it represents, requests the establishment of a medical monitoring program to be supervised by the Kanawha-Charleston Board of Health to oversee and direct

medical surveillance and provide for medical examinations and testing of its residents for latent dread diseases, including, but not limited to, neurological disease because residents of the City of Charleston and Kanawha County have been exposed to Crude MCHM, a known toxin, in greater concentrations than the public at large.

197.   Given that the exposed population in utero, infants, children up to the age of five were exposed to a chemical: 1) similar in structure to chemicals which are known or likely hazardous; 2) on which no studies have been performed; and 3) that early animal studies suggest cause blood disorders, tests and surveillance aimed at uncovering risks are readily available, generally accepted, and advantageous medically.

198.   Given the toxicity of the chemicals, the seriousness of the diseases for which residents of the City of Charleston and Kanawha County are at risk, the relative increase in the chance of onset of disease in those exposed, and the value of early diagnosis, such surveillance to monitor the effect of exposure to toxic chemicals is reasonable and necessary.

199.   It would be inequitable for residents of the City of Charleston and Kanawha County who have been wrongfully exposed to dangerous toxins, but unable to prove that is likely to have to pay the expense of medical monitoring, when such intervention is clearly reasonable and necessary.

## Count Fourteen – Punitive Damages

200.   Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

201.   The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs are thus entitled to recover punitive damages against Defendants.

202.    Defendants were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, in their activities and in failing to warn Plaintiffs of dangers well known to Defendants, which acts exhibited a deliberate disregard for the rights and safety of Plaintiffs and the residents of the City of Charleston and Kanawha County.

203.    Defendants realized the imminence of danger to Plaintiffs and members of the public, but continued their ultra-hazardous activities with deliberate disregard and complete indifference and lack of concern for the probable consequences of their acts.

204.    As a direct result of Defendants' deliberate disregard for the rights and safety of others, gross negligence, malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs, Plaintiffs and residents of the City of Charleston and Kanawha County suffered the injuries and dangers stated above.

205.    Defendants' acts as described herein exhibited deliberate disregard for the rights and safety of others and were malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. An award of punitive and exemplary damages is therefore necessary to punish Defendants, and each of them, and to deter any reoccurrence of this intolerable conduct. Consequently, Plaintiffs are entitled to an award of punitive damages.

206.    The conduct of Defendants as set forth herein was malicious, oppressive, willful, wanton, reckless, and/or criminally indifferent to civil obligations affecting the rights of others, including Plaintiffs. Plaintiffs are thus entitled to recover punitive damages against Defendants in an amount sufficient to punish Defendants for their wrongful conduct and to deter Defendants and others from similar wrongful conduct in the future.

43

## Count Fifteen – Equitable Remedy of Piercing the Corporate Veil Against the American Water Defendants

207.   Plaintiffs re-allege each and every allegation set forth in all preceding paragraphs as if fully restated herein.

208.   The following factors support piercing the corporate veil in this case against Defendants American Water, Services, and WVAW:  (1) There was a clear failure on the part of Defendant American Water to adequately capitalize the Defendant WVAW for the risks that any reasonable person would have recognized after being warned of the high susceptibility of contamination by the WVDHHR in April 2002; (2) Defendant American Water used the corporate vehicle as a mere conduit to operate Defendants WVAW and Services; (3) Defendant American Water ultimately owns all of the stock of Defendants WVAW and Services; (4) Defendant American Water shares the same address in Voorhees, New Jersey with its wholly-owned subsidiaries, Defendants WVAW and Services; (5) Defendant American Water shares the same law firm with Defendants WVAW and Services; (6) Defendant American Water reports consolidated financials that include the financial results of Defendants WVAW and Services; and (7) Defendant American Water failed to adequately mandate and capitalize the alternate water supply which Defendant WVAW should have created which would have mitigated or averted the current crisis.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs respectfully pray for a Jury Trial and for the following relief:

(1) An award of damages for Plaintiffs for past, present and future losses as a result of Defendants' conduct, acts, or omissions;

(2) An award of punitive damages for Plaintiffs;

(3) Prejudgment and post-judgment interest;

44

(4) An Order establishing a Medical Monitoring Program to be operated by the Kanawha-Charleston Board of Health that is designed to survey as appropriate and to protect residents of the City of Charleston and Kanawha County, West Virginia from latent, dread disease, funded by the Defendants;

(5) That the Court order the Defendants to pay for fees and costs of this proceeding;

(6) That the Court award appropriate penalties and attorney fees as allowed by law; and

(7) Such other relief as the Court or Jury may deem appropriate.

Respectfully Submitted:

THE CITY OF CHARLESTON,
WEST VIRGINIA, a West Virginia
Municipal Corporation; KANAWHA COUNTY,
WEST VIRGINIA, THE KANAWHA COUNTY
COMMISSION; THE CHARLESTON
CONVENTION AND VISITORS BUREAU;
THE KANAWHA-CHARLESTON BOARD OF HEALTH;

By Counsel,

William C. Forbes, Esq. (WVSB #1238)
W. Jesse Forbes, Esq. (WVSB #9956)
FORBES LAW OFFICES, PLLC
1118 Kanawha Boulevard, East
Charleston, WV 25301
Telephone: (304) 343-4050
Facsimile: (304) 343-7450

And

Timothy J. Dipiero, Esq. (WVSB #1021)
Sean P. McGinley, Esq. (WVSB #5836)
Robert M. Bastress, Esq. (WVSB #9616)
DITRAPANO BARRETT DIPIERO MCGINLEY & SIMMONS, PLLC
604 Virginia Street, East
Charleston, WV 25301
Telephone: (304) 342-0133

45



759

CERTIFIED MAIL

UNITED STATES POSTAGE
$ 07.59⁰
PITNEY BOWES
02 1R
0002009608
MAILED FROM ZIP CODE 25311
JAN 20 2016

BUSINESS & LICENSING
1630-00

**Mills, Karen**

| | |
|---|---|
| **From:** | sop@cscinfo.com |
| **Sent:** | Monday, January 25, 2016 7:10 PM |
| **To:** | Mills, Karen |
| **Subject:** | [I] Notice of Service of Process - Transmittal Number: 14712183 |

# Corporation Service Company ®

**NOTICE OF SERVICE OF PROCESS**

## Transmittal Number: <u>14712183</u>
(Click the Transmittal Number to view your SOP)

*For more information on instant access to your SOP, click <u>Sign Me Up</u>.*

Pursuant to client instructions, we are forwarding this summary and Notice of Service of Process.

| | |
|---|---|
| **Entity:** | Eastman Chemical Company |
| **Entity I.D. Number:** | 1724422 |
| **Entity Served:** | Eastman Chemical Company |
| **Title of Action:** | The City of Charleston, West Virginia vs. West Virginia-American Water Company |
| **Document(s) type:** | Summons/Complaint |
| **Nature of Action:** | Environmental |
| **Court/Agency:** | Kanawha County Circuit Court, West Virginia |
| **Case/Reference No:** | 16-C-32 |
| **Jurisdiction Served:** | West Virginia |
| **Date Served on CSC:** | 01/25/2016 |
| **Answer or Appearance Due:** | 30 Days |
| **Originally Served On:** | WV Secretary of State on 01/15/2016 |
| **How Served:** | Certified Mail |

**Sender Information:**
William C. Forbes
304-343-4050

**Primary Contact:**
Karen  Mills
Eastman Chemical Company Legal Department

**Copy of transmittal only provided to:**
William McGreevey
Marty Parrish

1

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the document(s) and taking appropriate action.

---

Please visit www.cscglobal.com for more information related to CSC's Litigation and Matter Management services, including MYSOP, online acknowledgement of SOP and to view a complete library of all SOP received or your behalf by CSC.

**CSC is SSAE 16 certified for its Litigation Management System.**

2711 Centerville Road   Wilmington, DE 19808
(888) 690-2882   |



CORPORATION SERVICE COMPANY®

# Notice of Service of Process

MDM / ALL
Transmittal Number: 14712183
Date Processed: 01/25/2016

Primary Contact:     Karen Mills
                     Eastman Chemical Company Legal Department
                     100 North Eastman
                     Kingsport, TN 37660

Copy of transmittal only provided to:     William McGreevey
                                           Marty Parrish

| | |
|---|---|
| Entity: | Eastman Chemical Company<br>Entity ID Number 1724422 |
| Entity Served: | Eastman Chemical Company |
| Title of Action: | The City of Charleston, West Virginia vs. West Virginia-American Water Company |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Environmental |
| Court/Agency: | Kanawha County Circuit Court, West Virginia |
| Case/Reference No: | 16-C-32 |
| Jurisdiction Served: | West Virginia |
| Date Served on CSC: | 01/25/2016 |
| Answer or Appearance Due: | 30 Days |
| Originally Served On: | WV Secretary of State on 01/15/2016 |
| How Served: | Certified Mail |
| Sender Information: | William C. Forbes<br>304-343-4050 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

*CSC is SAS70 Type II certified for its Litigation Management System.*

2711 Centerville Road   Wilmington, DE 19808   (888) 690-2882  |  sop@cscinfo.com

Office of the Secretary of State
Building 1 Suite 157-K
1900 Kanawha Blvd E.
Charleston, WV 25305



USPS CERTIFIED MAIL™



9214 8901 1251 3410 0000 9358 93

EASTMAN CHEMICAL COMPANY
Corporation Service Company
209 West Washington Street
Charleston, WV 25302

**Natalie E. Tennant**
Secretary Of State
State Of West Virginia
Phone:  304-558-6000
866-767-8683
Visit us online:
www.wvsos.com

Control Number: 87930

Defendant: EASTMAN CHEMICAL COMPANY
209 West Washington Street
Charleston, WV 25302 US

Agent: Corporation Service Company

County: Kanawha

Civil Action: 16-C-32

Certified Number: 92148901125134100000935893

Service Date: 1/15/2016

I am enclosing:

1 summons and complaint

which was served on the Secretary at the State Capitol as your statutory attorney-in-fact. According to law, I have accepted service of process in the name and on behalf of your corporation.

*Please note that this office has no connection whatsoever with the enclosed documents other than to accept service of process in the name and on behalf of your corporation as your attorney-in-fact. Please address any questions about this document directly to the court or the plaintiff's attorney, shown in the enclosed paper, not to the Secretary of State's office.*

Sincerely,

Natalie E. Tennant
Secretary of State